**SO ORDERED.**

**SIGNED this 28th day of August, 2014.**



_____
Robert E. Nugent
United States Chief Bankruptcy Judge

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF KANSAS

IN RE: )
)
CHARLES TIMOTHY BOWLING, ) Case No. 12-10635
) Chapter 13
Debtor. )
_____)

### ORDER ON DEBTOR'S COUNSEL'S FIRST FEE APPLICATION FOR ADDITIONAL COMPENSATION (*Dkt. 77*)

A chapter 13 debtor's lawyer may be granted reasonable fees for representing the debtor in the case, but the lawyer's work must be necessary and beneficial to the case's completion and not duplicative. The reasonableness of the fees requested must be measured against the provisions of 11 U.S.C. § 330(a)(3)(A)–(F). In this small case,[1] Eron Law Office (the "Firm"), applied for fees of $11,855, nearly quadrupling the presumptive chapter 13 attorney's fee of $3,000 that is customarily awarded in

---

[1] The debtor listed assets of $4,140 and debts of $38,094. Filed claims totaled $21,473.

1

this division.[2] I independently reviewed the Firm's fee application and its itemized billing statements and applied the various provisions of § 330(a)(3), taking particular notice of how much time the Firm's members spent on various activities, the necessity and benefit of the services at the time they were rendered, and lack of complexity this case presented. Based on that review, I allow the application in part and deny the balance.

Facts

Charles Timothy Bowling filed this case after the Kansas Department of Revenue (KDOR) seized personal property associated with his operation of a gift shop pursuant to tax warrants on March 19, 2012.[3] He owed KDOR unpaid sales taxes in excess of $20,000. The following day, after consultation with David Eron, Bowling filed a pro se chapter 13 petition. Eron began acting on Bowling's behalf on March 21 and entered his appearance on March 23. Bowling agreed to pay the Firm $3,350 for representation in the chapter 13 over 12 months. The Firm's Fed. R. Bankr. P. 2016(b) disclosure referred to the $3,000 fee as the "base fee – additional charges may apply" as governed by the retainer agreement. The retainer agreement is not in the record. In return for the $3,000 base fee, Eron agreed to render legal service "for all aspects

---

[2] Of the $11,855 total, all was attributable to attorney fees save $30 in expenses for which reimbursement is sought.

[3] According to the statement of financial affairs (SOFA), item 18, the gift shop ceased operation December 31, 2011. But item 1 of the SOFA reflects that debtor ran the gift shop as a sole proprietorship in 2012 (generating income of about $3,400) until the KDOR executed its tax warrants on the personal property at the gift shop. The billing statements suggest that debtor continued to operate the gift shop during the pendency of the bankruptcy, at least through July of 2012 when it appears he vacated the leased premises at Chisholm Trail. *See* Dkt. 77-1, p. 6.

2

of the bankruptcy case," including "preparation and filing of any petition, schedules, statements of affairs and plan which may be required" and "representation of the debtor at the meeting of creditors and confirmation hearing, and any adjourned hearings thereof."[4]

The schedules filed in this case reflect assets of $4,140.50 and debts of $38,094.12. Bowling is a conductor/engineer for the Union Pacific railroad, is married, and has three dependent children.

Within days of the bankruptcy filing, Eron negotiated an agreed adequate protection order with the KDOR which provided that the pre-confirmation adequate protection payments would be paid to the chapter 13 trustee upon confirmation of Bowling's plan.[5] Eron's associate Justin Leck then completed and filed the remaining bankruptcy schedules and Bowling's chapter 13 plan on June 13, 2012.[6] The plan proposed to pay $450 for 60 months for a total of $27,000 and provided for payment of the KDOR's tax claim in full. Debtor's disposable income calculation on Form 22C yielded a negative $27.87.[7] Bowling had no other debts secured by real estate or a principal residence. He had no debts secured by vehicles or other personal property. Only one objection to confirmation of the chapter 13 plan was filed – that of the chapter 13 trustee.[8] She asserted feasibility, disposable income, and bad faith

---

[4] Dkt. 17.
[5] Dkt. 11.
[6] Dkt. 18.
[7] Dkt. 17, p. 41, line 59.
[8] Dkt. 26.

3

objections as well as debtor's failure to provide his 2011 tax returns.

Six months later, in late 2012, the trustee filed a motion to compel under local rule seeking debtor's compliance with the trustee's request for information and documentation supporting his claimed transportation expense and charitable contributions, information that was relevant to the trustee's disposable income objection.[9] The trustee had requested this information from debtor at the § 341 meeting and followed up with written requests to the debtor or debtor's counsel on at least five more occasions after the § 341 meeting. After numerous continuances of the confirmation hearing, Bowling's chapter 13 plan and the trustee's objection were announced as resolved at the March 19, 2013 confirmation hearing and an order confirming the plan as modified was entered on April 25, 2013.[10] The confirmed plan, as modified, provided for an increase of $145 in the monthly plan payment to pay disposable income of $8,373.[11]

On April 17, 2014, the Firm filed this First Application for Compensation for the period March 1, 2012 to March 31, 2014 in the amount of $11,855 (which included $30 of expenses), together with the itemized monthly billing statements generated during the period.[12] Bowling objected to the Application and requested a hearing, but

---

[9] Dkt. 48. *See* D. Kan. L.B.R. 4002.2(a) requiring compliance with the trustee's requests for information within 14 days.

[10] Dkt. 70. Those continuances of the confirmation hearing were due in large part to debtor's failure or lengthy delay in responding to the trustee's requests for information and documentation. Two of the continuances were due to the terminal illness of debtor's wife.

[11] An amended confirmation order entered on July 15, 2013, specified that the Firm's attorney fees paid through the plan were $3,000, plus an additional $350 closing fee. Dkt. 72.

[12] Dkt. 77.

4

did not specify the nature of his objection.[13] He appeared at the hearing held on July 9, 2014. His chief complaint was that the fees are unreasonable because he continually dealt with a different person in the Firm and he had to bring them "up to speed" when he communicated with them. He believes that a standard fee in a chapter 13 case should be around $4,000.

Analysis

Bankruptcy courts independently evaluate the propriety of fees requested by debtor's counsel.[14] Section 330(a)(4)(B) of the Code authorizes the court to allow "reasonable compensation" to a debtor's attorney for "representing the interests of the debtor in connection with the bankruptcy case." To determine whether the fees requested are indeed "reasonable," we consider the benefit and necessity of the services rendered along with the nonexclusive factors listed in § 330(a)(3).[15] The applicant bears the burden of establishing the reasonableness of the compensation sought.[16] Section 330(a)(3)(C) requires that we consider not only whether the services were "necessary," but whether they were necessary or beneficial to completion of the case at the time they were rendered. The factors listed in §330(a)(3) are substantially similar to those applied to attorney fee applications in every other forum. They are –

(A) the time spent on such services;
(B) the rates charged for such services;

---

[13] Dkt. 79.
[14] *In re Tahah,* 330 B.R. 777, 780-81 (10th Cir. BAP 2005).
[15] *In re Rogers,* 401 B.R. 490, 492-93 (10th Cir. BAP 2009).
[16] *Id.* at 493-94.

5

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.[17]

Contested chapter 13 fee applications are rare in this court because, in 2009, I increased the presumptive fee in a chapter 13 case in this Division from $2,500 to $3,000.[18] As I noted then, the presumptive fee is the maximum allowable fee a debtor's lawyer can receive without submitting a detailed fee application. It is intended to cover routine legal services in chapter 13 cases from initial consultation and preparation of the petition through plan confirmation. Never have I barred counsel who believe they are entitled to more than the presumptive fee from seeking further fee allowance provided a proper fee application is submitted.[19]

All but $200 of the requested fees were billed before confirmation of the plan over a year ago. Other than the instant Application, there have been no other

---

[17] 11 U.S.C. § 330(a)(3). *See also In re Permian Anchor Services, Inc.,* 649 F.2d 763 (10th Cir. 1981)(adopting the lodestar analysis and twelve *Johnson* factors set forth in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717-19 (5th Cir. 1974) for determining the reasonableness of fees); *In re Lederman Enterprises, Inc.,* 997 F.2d 1321, 1323 (10th Cir. 1993).

[18] *See In re Hueser,* No. 09-10601, 2009 WL 2849607 (Bankr. D. Kan. Aug. 31, 2009) (three companion cases involving consumer chapter 13 cases).

[19] In *Rogers, supra,* the BAP held that once the attorney files a fee application, they are no longer entitled to the "standard fee." 401 B.R. at 494 (noting that the presumptive fee is designed to be the maximum fee allowed without a detailed fee application and not a minimum fee to be awarded in all cases).

6

substantive post-confirmation proceedings or motions in the case. The itemized statements do not contain a recapitulation of time spent and fees billed for each timekeeper that contributed to the total fee. The Court's own summary allocates the time and fees among the attorneys and law Firm staff as follows:

| Attorney or Legal Assistant | Hours | Fees |
|---|---|---|
| Attorney DPE | 8.80 | 1,850.00 |
| Attorney EKW | 4.50 | 900.00 |
| Attorney JRL | 22 | 2,800.00 |
| Attorney JWR | 25.40 | 5,120.00 |
| Legal Assistant ECD | 12.10 | 907.50 |
| Legal Assistant BAM | 2.8 | 210.00 |
| Legal Assistant AB | .50 | 37.50 |
| Total Fees Billed | | $11,825.00 |

The hourly rates charged are not excessive. They compare favorably to what attorneys in this area charge for work done outside of bankruptcy. Both Mr. Eron and Mr. Rockett have considerable experience in this court and, while neither Mr. Leck nor Ms. Wilson is as experienced, they both could handle a routine chapter 13 case like this one.

This case calls for the application of subparagraphs (a)(3)(C), (a)(3)(D), and (a)(4). Section 330(a)(4)(A) disallows compensation for unnecessary duplication of services or services that were neither likely to benefit the estate or necessary to its administration. Subparagraph (a)(3)(C) requires that the work done must have been necessary or beneficial to the completion of the case *at the time it was done*. Subparagraph (a)(3)(D) requires that the time spent be reasonable "commensurate with the complexity, importance, and nature of the problem."

What made this case so expensive? There are some general causes. The Firm's

7

minimum billing increment appears to be .2, or 12 minutes, potentially inflating fees for routine work like leaving a phone message on the recipient's phone or sending a brief e-mail to the intended recipient. There are a few instances of "batched entries" that I ordinarily disallow, but, in general, the vast majority of time entries are less than .4 hours and when describing multiple tasks within a single time entry, those tasks tend to be closely related.[20] There are instances of duplication of services that are attributable to two or three lawyers and/or staff participating in intraoffice conferences or reporting case status or progress to one another. Indeed, all of the attorneys and three legal assistants in the Firm touched the Bowling case at various times.[21] While these communications may have been expedient, they increased the bill. That said, the Firm exercised billing judgment by reducing or deleting charges for some services, including several of the types of entries just noted, writing off $3,127.50 in fees before submitting this Application.[22]

This is neither a big nor a complex case. Mr. Eron worked out the KDOR issues without formally seeking court relief from the seizure or the turnover of the property.[23] Bowling hoped to halt further enforcement of the KDOR's claim against

---

[20] *See In re Recycling Industries, Inc.*, 243 B.R. 396, 406 (Bankr. D. Colo. 2000) (practice of "lumping" [or batching] tasks into a single time entry is "universally disapproved" by bankruptcy courts.)

[21] Attorney Leck's involvement in the case ended in December of 2012 and Attorney Rockett's participation began in January of 2013. Attorney Wilson's involvement in the case was fairly limited to court appearances for continuing the hearing on confirmation and for attending the § 341 meeting of creditors.

[22] This figure is comprised of services that were "no charge" and fees that were written off or reduced. The bulk of the write-offs were attributable to attorneys Leck ($1,137.50) and Rockett ($1,600).

[23] As noted previously, debtor apparently continued operation of the gift shop as a sole proprietorship to some degree until the end of July, 2012. At that point, he vacated the leased

8

him and to enable him to repay the liquidated tax claim over a 5-year period. The KDOR's claim against debtor was resolved and its treatment in the bankruptcy was negotiated three days after the petition date by a joint motion for adequate protection providing for monthly payments of $362.44.[24] The total charge for this work was $440.[25] There were no continuing operating issues.

After the adequate protection agreement was reached with KDOR, the Firm proceeded to prepare the schedules, statement of financial affairs, creditor matrix, and the plan. Time entries related to these tasks from April to early July, 2012 total approximately 17 hours and $1,955.[26] Some of the time entries involve office conferences between multiple law office staff and unnecessarily increased the time and costs. Time and fees related to the § 341 meeting are approximately 3.3 hours for $597.50.[27] Some of the time entries on June 20, 2012 appear to be duplicative and one time entry of attorney Leck is a batched entry of 1.5 hours. By September 30, 2012, the Firm had billed Bowling $5,732 even though the plan had never been confirmed.

Much additional time was spent on responding to informational requests made by the trustee in addressing her feasibility, disposable income, and good faith

---

premises. *See* note 3, *supra*.

[24] As the joint motion represented, the monthly payment "represents full payment of KDOR's claim over 60 months with interest at 3% per annum." Dkt. 6, p. 2, ¶ 7.

[25] Per the March 2012 fee statement, the agreed upon treatment of the KDOR's tax claim was accomplished in 2.20 hours and $440 in attorney fees. Dkt. 7-1, p. 1.

[26] Dkt. 77-1, pp. 2-6. The figure for total fees takes into account the reductions made by counsel exercising billing judgment. *See* Dkt. 77-1, p. 6.

[27] Dkt. 77-1, pp. 2, 4.

9

objections. Because she received no responses to her informal requests for information, the trustee filed a motion to compel the delivery of the information, most of which related to transportation expenses claimed by Bowling and charitable contributions. It's worth noting that the Bowlings have previously filed jointly for chapter 13 relief in this court and Mr. Bowling should have some level of expectation about what he would be required to tell the trustee about their expenses.[28] Counsel was certainly obligated to remind them of that obligation.

The Firm's statements for the period from late September of 2012 through February of 2013 reflect one lawyer's attending the initial confirmation hearing on September 12, 2012, followed by several months of the Firm's attempts to secure transportation expense information from Bowling in order to satisfy the trustee's requests. Then, in February, the Firm expended some $1,762 in time in further dealing with the trustee's eminently reasonable request for income tax returns and expense information supporting the debtor's claimed transportation and charitable contribution expenses. The Firm also sought and twice secured a continuance of the evidentiary hearing on confirmation because Mrs. Bowling was ill with cancer. It is unclear whether the trustee got the information she sought in February.

The final push to confirmation occurred in March. I set an evidentiary hearing for March 19 and the Firm, principally Mr. Rockett, geared up for trial, billing more than $2,500 for that work. The trial did not happen, though, because the parties

---

[28] *See* Case No. 07-11205, filed in May of 2007 and converted to chapter 7 in May of 2008. The debtors received a chapter 7 discharge in 2010.

10

reached an agreement that they announced on trial day. In April, the trustee withdrew the Motion to Compel.

The nearly year-long passage of time between filing the chapter 13 plan and confirming the plan was largely due to Mrs. Bowling's illness and the debtor's delay in responding to the trustee's request for information and documentation that supported the debtor's projected disposable income calculation. After she filed a motion to compel, the trustee either got what she sought or Bowling was unable to substantiate his expenses, and the parties quickly settled the trustee's confirmation objection by the debtor increasing his plan payment $145 per month.

As noted, there were no formal proceedings begun to cause KDOR to turn over the seized business assets – that was accomplished without Court intervention. But considerable time appears to have been spent on the trustee's document requests, due in large part to the debtor's failure to provide them timely. And, once the matter was finally set for trial, counsel certainly had to prepare for trial and, to the extent that time was commensurate with the complexity and novelty of the tasks at hand, it should be compensated. Only three claims were filed in the case and debtor made no claims objections. The trustee objected to debtor's claim of exemption in two vehicles but debtor amended Schedule C the same date as the trustee's objection to delete one of the vehicles, and the trustee withdrew her objection. Debtor was not required to defend any motions for relief from the automatic stay nor motions to dismiss for nonpayment of plan payments. In short, the anticipated trial boiled down to the amount of Bowling's disposable income, the issue that the trustee had raised from

11

the outset.

The Firm charged for a total of 45 hours and $5,922 from October of 2012 through April of 2013.[29] Not much was accomplished compared to the time spent; there were several appearances at confirmation hearings and continuances. Some of the delay was attributable to debtor's failure to provide information. Numerous attorneys billed time regarding confirmation and much time was devoted to interoffice conferences and requests to the debtor. Given the primary issue driving confirmation of the plan and the lone objection to confirmation filed by the trustee, the time incurred on confirmation is simply not reasonable.[30]

Conclusion

The Firm spent more time than was necessary to complete this case. Some of this is due to the inefficiencies and inevitable duplication of services that occurs when four lawyers and several staff members "touch" a file. Some of it is due to Bowling's failure or inability to respond timely to the trustee's information requests. Some of it is simply duplicative. In the absence of any other evidence justifying these charges individually, I am left to balance the Firm's right to recover reasonable compensation for the benefit it conferred on the debtor and the estate with the debtor's right to be assessed a fair fee, consistent with the Bankruptcy Code.[31] In striking that balance,

---

[29] Dkt. 77-1, pp. 4, 6, 8-19.
[30] The Court notes that approximately one-fourth of attorney Rockett's time was attributable to preparation of the evidentiary hearing on confirmation, which hearing of course, was never held.
[31] In applying the Code's fee provisions, I take no notice that (1) the trustee believes the allowance of the application in full would render the plan unfeasible; or (2) that the Firm has since moved to withdraw. Neither point bears on the reasonableness, necessity or benefit of the Firm's services

12

I am mindful that some of the fees here were caused by the debtor's circumstances in being unable, for whatever reason, to provide the information the trustee requested. Considering what §330(a)(3) requires me to consider, I conclude that the $5,732 charged from the outset of the case through September of 2012 should be reduced by 50%, or $2,866, because of duplication of services and excessive time spent assembling the schedules and the plan, viewed in light of the lack of complexity of the case. Likewise, I reduce the fees claimed from October of 2012 through April of 2013 of $5,922 by 50%, or $2,961, for the same reasons. These reductions total $5,827. The remainder of the fees charged, $5,998, and the $30 filing fee for an amended creditor matrix, are approved. The Firm's fee and expense application is therefore allowed in the amount of $6,028; the balance of the application is denied.

### 

---

under § 330.